USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 93-2244 IN RE SAVAGE INDUSTRIES, INC., Debtor,  ________ WESTERN AUTO SUPPLY COMPANY, Defendant, Appellee, v. SAVAGE ARMS, INC., Plaintiff, Appellant.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior U.S. District Judge] __________________________  ____________________ Before Torruella, Cyr and Boudin, Circuit Judges. ______________  ____________________ Paul H. Rothschild, with whom Michael B. Katz, Susan Luttrell ___________________ ________________ ______________ Burns and Bacon & Wilson, P.C. were on brief for appellant. _____ ____________________ Mark G. DeGiacomo, with whom James P. Rooney, Edward J. Rozmiarek _________________ _______________ ___________________ and Roche, Carens & DeGiacomo were on brief for appellee. _________________________  ____________________ December 14, 1994  ____________________ CYR, Circuit Judge. The question presented on appeal CYR, Circuit Judge. ______________ is whether the bankruptcy court properly enjoined a state-law based "successor product-line liability" action in an Alaska court against an entity which had acquired a corporate chapter 11 debtor's assets by purchase and subject to an explicit disclaimer of liability on all unfiled claims relating to products manufactured by the chapter 11 debtor. On intermediate appeal, the district court vacated the injunction. As we conclude that injunctive relief was improvidently granted, we affirm the district court order. I I BACKGROUND BACKGROUND __________ A. The "Successor Liability" Claim A. The "Successor Liability" Claim _______________________________ In February 1988, Savage Industries, Inc. ("Debtor Industries"), a Massachusetts firearms manufacturer, commenced voluntary chapter 11 proceedings in the United States Bankruptcy Court for the District of Massachusetts and obtained authorization to operate its business as a debtor in possession. One month later, appellant Savage Arms, Inc. ("Arms") was incor- porated. In May 1989, Debtor Industries submitted a proposal to sell substantially all its corporate assets to Arms.1 The bankruptcy court approved the proposed sale in July 1989.  ____________________ 1The assets included all Debtor Industries' real estate, manufacturing equipment, leases, contracts, corporate records, patents, trademarks, cash, accounts receivable, and inventory. The assets were sold subject to all liens. 2 Although the court order prescribed safeguards for interests held by objecting creditors, it neither required court approval of the _________ asset-transfer terms subsequently negotiated between Debtor ____________ __________ _______ ______ Industries and Arms, nor made provision for the interests of __________ ___ ____ holders of contingent product liability claims against Debtor Industries.2 On November 1, 1989, Debtor Industries and Arms closed their asset transfer agreement, wherein Arms assumed liability for certain pending product liability claims against Debtor _______ Industries, but explicitly disclaimed all liability for any other __________ product liability claims relating to firearms manufactured by Debtor Industries prior to the closing date.3 Debtor Industries  ____________________ 2The order approving the sale provided as follows: ORDERED, that [DEBTOR] INDUSTRIES . . . is hereby authorized to enter into and conclude within sixty (60) days of this Order becoming final and non-appealable a Definitive Agreement (the "Agreement") with SAVAGE ARMS, INC. ("Purchaser") providing for the sale and transfer of its real property and certain of its tangible and intangible assets to Purchaser and the assumption by Purchaser of certain secured and priority liabilities as set forth in this Order . . . . 3Section 2(b) of the Asset Transfer Agreement states, in pertinent part: Arms does not assume, and [Debtor Industries] shall pay, perform and discharge: . . . . (iv) any liability or obligation resulting from or arising out of claims for personal injury or property damage based on the malfunction or failure of any product manufactured or distributed, in whole or in part, by [Debtor Industries], arising out of any act, omission, event, occurrence or circumstance that existed on or before Closing, except to the extent 3 ceased to operate immediately after the asset transfer was consummated. Thereupon, without interruption, Arms took up the manufacture of the identical lines of firearms previously produced by Debtor Industries. Meanwhile, in May 1989, shortly before Debtor ______ Industries submitted its proposal to transfer its assets to Arms, Kevin Taylor had been injured by a "Stevens" .22 caliber firearm manufactured by Debtor Industries. One year after the chapter 11 _____ asset transfer was consummated, Taylor brought a products liability action against Debtor Industries in an Alaska state court. Later, Western Auto Supply Company ("Western Auto"), the retail distributor which sold Taylor the allegedly defective firearm, was added as a party defendant. Although Taylor did not name Arms as a defendant, in due course Western Auto filed a third-party complaint alleging that Arms had incurred "successor product-line liability" under Alaska law by continuing to manufacture the identical firearms theretofore manufactured by Debtor Industries. Western Auto demanded either indemnification or an apportionment of damages from Arms as successor to Debtor  ____________________ expressly set forth in Schedule 2 or Section 4(f) hereof . . . . Debtor Industries warranted, in Section 6(e), that only 44 product liability claims were pending at the time of the asset transfer. In Section 4(f), Arms conditioned its purchase agreement on the bankruptcy court's estimate that 24 pending prepetition product liability claims against Debtor Industries did not exceed $400,000 in aggregate value. 4 Industries.4 In June 1991, the bankruptcy court confirmed the chapter 11 liquidation plan, which made no provision for contingent product liability claims disclaimed by Arms under its November 1989 asset transfer agreement with Debtor Industries. The asset-transfer proceeds began to be disbursed under the confirmed chapter 11 plan in February 1992. Thereafter, Arms commenced this adversary proceeding against Western Auto in the United States Bankruptcy Court for the District of Massachusetts, requesting declaratory and injunctive relief against further prosecution of Western Auto's  ____________________ 4As a general rule, a corporation which acquires another corporate entity's assets does not assume the seller's liabilities unless (1) the buyer expressly assumes those liabilities; (2) the transaction constitutes a merger or consolidation; (3) the buyer is a mere extension of the seller; or (4) the transaction amounts to a fraudulent or collusive attempt to avoid the seller's liabilities. See Conway v. White ___ ______ _____ Trucks, 885 F.2d 90, 93 (3d Cir. 1989); Ray v. Alad Corp., 560 ______ ___ __________ P.2d 3, 7 (Cal. 1977). Several states, including California and New Jersey, have adopted a "hybrid" exception to the general rule precluding implied successor liability, known as "product-line" liability. Its elements commonly include: (1) the total or virtual extinguishment of tort remedies against the seller as a consequence of an all-asset sale; (2) the buyer's continued manufacture of the same product lines under the same product names; (3) the buyer's continued use of the seller's corporate name or identity, and trading on the seller's good will; and (4) the buyer's representation (e.g., advertising) to the public that ____ it is an ongoing enterprise. See, e.g., Conway, 885 F.2d at 93; ___ ____ ______ Ray, 560 P.2d at 11.  ___ A three-part policy underlies the "product-line" liability doctrine: (1) such all-asset acquisitions virtually eliminate the tort plaintiff's remedies against the seller, which usually dissolves after the sale; (2) the buyer becomes the most efficient conduit for effecting the cost-spreading policy at the root of strict tort liability; and (3) fairness demands that the buyer the party enjoying the economic benefits of its predecessor's good will bear the initial financial burden of its predecessor's contingent product liability. Id. at 8-9. ___ 5 third-party complaint in Alaska state court. Arms asserted that it acquired Debtor Industries' assets "free and clear" of all product liability claims against Debtor Industries, except those disclosed to Arms by Debtor Industries prior to the chapter 11 asset transfer. See supra notes 2 & 3. ___ _____ B. The Injunction  B. The Injunction ______________ Notwithstanding the contention that it lacked jurisdic- tion once the asset transfer had been consummated, the bankruptcy court enjoined further prosecution of Western Auto's third-party action against Arms in Alaska state court. The bankruptcy court concluded that it retained the requisite jurisdiction to enjoin any hostile "claim" which contravened the terms of the asset transfer agreement approved by the bankruptcy court in the pending chapter 11 proceeding. Savage Arms, Inc. v. Taylor (In _________________ ______ __ re Savage Arms, Inc.), No. 88-40046-JFQ, slip op. at 4-5 (Bankr. _____________________ D. Mass. Oct. 5, 1992). But cf. Mooney Aircraft v. Foster (In re ___ ___ _______________ ______ _____ Mooney Aircraft), 730 F.2d 367 (5th Cir. 1984) (bankruptcy court ________________ lacks jurisdiction to enjoin successor liability claims arising one year after close of bankruptcy proceedings).  _____ The bankruptcy court reasoned that even assuming Alaska were to adopt a common law "successor product-line liability" doctrine, see, e.g., Dawejko v. Jorgensen Steel Co., ___ ____ _______ ___________________ 434 A.2d 106 (Pa. Super. Ct. 1981); supra note 4 the Western _____ Auto claim against Arms would be preempted by the Bankruptcy Code insofar as it constituted a tort "claim" against Debtor Industries which arose before either the chapter 11 asset ______ 6 transfer or the order confirming the chapter 11 plan. Savage ______ Arms, Inc., slip op. at 2-3 (citing Volvo White Truck Corp. v. __________ ________________________ Chambersburg Beverage, Inc. (In re White Motor Truck Corp.), 75 ____________________________ ______________________________ B.R. 944, 950 (Bankr. N.D. Ohio 1987); American Living Systs. v. ______________________ Bonapfel (In re All American of Ashburn, Inc.), 56 B.R. 186, 190 ________ ____________________________________ (Bankr. N.D. Ga. 1986)). Since the confirmed chapter 11 plan restricted claimants to their pro rata share of the net proceeds ___ ____ realized from the all-assets transfer, the bankruptcy court considered injunctive relief essential to prevent Western Auto from circumventing the Bankruptcy Code priority scheme by obtaining full recovery from Arms, the chapter 11 debtor's successor. Because Taylor and Western Auto held "claims" against Debtor Industries that could be dealt with under the confirmed _____ __ _____ ____ chapter 11 plan, and since asset transfers under Bankruptcy Code 363(f) are effected "free and clear of any interest" in the transferred assets,5 the bankruptcy court ruled that the  ____________________ 5Section 363(f) provides: (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 7 explicit disclaimer in the asset transfer agreement must be given full effect, at least in the absence of collusion. Savage Arms, ____________ Inc., slip op. at 3. Finally, the court expressed concern that ____ such successor liability actions might "chill" all-asset sales under chapter 11 by prompting potential purchasers to hedge their bids against unquantifiable future product liability costs. Id. ___ at 5. See also Paris Mfg. Corp v. Ace Hardware Corp. (In re ___ ____ ________________ __________________ _____ Paris Indus. Corp.), 132 B.R. 504, 508 n.7 (D. Me. 1991). __________________ Western Auto took an intermediate appeal to the district court, which concluded that the bankruptcy court lacked jurisdiction to enjoin prosecution of the Alaska state court action. This appeal followed.6 II II DISCUSSION DISCUSSION __________  ____________________ Bankruptcy Code 363(f), 11 U.S.C. 363(f). 6After the district court decision, but prior to oral argument in this appeal, the Alaska court severed the Taylor claim against Western Auto from the third-party "successor liability" claim against Arms, allowing the former to proceed to trial. Judgment eventually entered for Western Auto. Although it is not known whether Taylor appealed the adverse state court judgment, failure to do so would not moot the present appeal since Western Auto represents that it will seek indemnification for its litigation costs from Arms, based on its "successor __________ _____ liability" theory. See, e.g., Anderson v. United States Dep't of ___ ____ ________ ______________________ Health and Human Servs., 3 F.3d 1383, 1384-85 (10th Cir. 1993) ________________________ (noting that although "'a claim of entitlement to attorney's fees does not preserve a moot cause of action, the expiration of the underlying cause of action does not moot a controversy over attorney's fees already incurred'") (citation omitted) (emphasis _______ ________ added); Heritage v. Pioneer Brokerage & Sales, 604 P.2d 1059, ________ ___________________________ 1065-67 (Alaska 1979) (once retailer establishes an implied-at- law right to indemnification from product manufacturer, it may recover its litigation costs and attorney fees in successfully ____________ defending against customer's tort action). 8 The bankruptcy court reasoned that the requisite jurisdiction to enjoin further prosecution of the state court "successor liability" action summoned from its power to enforce its own order approving the all-assets transfer,7 in furtherance of two fundamental Bankruptcy Code themes: the Code priority scheme and maximization of creditor recoveries. For the reasons hereinafter discussed, we believe the rationale undergirding the bankruptcy court decision is flawed.8  ____________________ 7Even though the bankruptcy court did not do so, Arms has devoted considerable attention to the precise statutory source of the bankruptcy court's "jurisdiction" to enjoin prosecution of the Alaska state court action. See, e.g., 28 U.S.C. 157(a), ___ ____ 1334; Bankruptcy Code 105(a), 11 U.S.C. 105(a). Further, Arms suggests that it may opt to rescind the chapter 11 asset transfer if found liable as Debtor Industries' "successor." But ___ see Zerand-Bernal Group v. Cox, 23 F.3d 159, 164 (7th Cir. 1994) ___ ___________________ ___ (rescission of all-asset sale which formed "core and premise" of chapter 11 plan is precluded 180 days after confirmation of plan). Western Auto responds that the bankruptcy court lacked jurisdiction because by the time Savage sought injunctive relief the reorganization plan had been confirmed and substantially all chapter 11 estate assets had been distributed to creditors. Therefore, the Alaska state court action could have had no conceivable effect on the administration of the chapter 11 case. ______ See, e.g., In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. ___ ____ ___________________ 1991). We need not address these jurisdictional questions, as we conclude that the bankruptcy court misapprehended the effect of its July 1989 order approving the asset transfer to Arms. See ___ infra Section II.B. _____ 8"[We] undertake[] an independent review of the bankruptcy court order, utilizing the same appellate standards governing the district court review." Laroche v. Amoskeag Bank (In re Laroche), _______ _____________ _____________ 969 F.2d 1299, 1301 (1st Cir. 1992). Rulings on permanent injunctive relief are reviewed for "abuse of discretion." See ___ Caroline T. v. Hudson Sch. Dist., 915 F.2d 752, 754-55 (1st Cir. ___________ _________________ 1990); Sturge v. Smouha (In re Petition of Smouha), 136 B.R. 921, ______ ______ ________________________ 925 (S.D.N.Y. 1992). Four principal factors govern the appropriateness of permanent injunctive relief: (1) whether the plaintiff has prevailed on the merits; (2) whether the plaintiff will suffer irreparable injury absent injunctive relief; (3) whether the harm to the plaintiff outweighs any harm threatened by the injunction; and (4) whether the public interest will be 9 A. The Code Priority Scheme A. The Code Priority Scheme ________________________ The bankruptcy court expressed concern that unless such successor liability actions are enjoined, claimants will be encouraged to forego their chapter 11 remedies in favor of the more lucrative state-court recoveries conceivably available against the chapter 11 debtor's successor. We believe this concern to be unwarranted. For one thing, it is more illusory than real, given the nature of the successor product-line liability doctrine itself. See supra note ___ _____ 4. As a general rule, a successor to the chapter 11 debtor would be absolved of strict tort liability if the claimant failed to pursue any available chapter 11 remedy. See, e.g., Conway v. ___ ____ ______ White Trucks, 885 F.2d 90, 95 (3d Cir. 1989) (applying _____________ Pennsylvania law). Yet more conclusively, the "circumvention" concern relied upon by the bankruptcy court is inapposite to the present context since there is no record indication that any attempt was made to afford notice to Taylor or Western Auto as _______ holders of contingent postpetition product liability claims, see ___ Bankruptcy Code 502(c), 11 U.S.C. 502(c). We enlarge upon the latter point. Notice is the cornerstone underpinning Bankruptcy Code procedure. Under the Bankruptcy Reform Act of 1978 in a  ____________________ adversely affected by the injunction. Caroline T., 915 F.2d at ___________ 754-55. Although its conclusions of law are subject to plenary review, the bankruptcy court's findings of fact, "whether based on oral or documentary evidence," are not to be set aside unless "clearly erroneous." Fed. R. Bankr. P. 8013. 10 deliberate departure from its forerunners virtually all administrative responsibilities were removed from the bankruptcy judge. See, e.g., In re Sullivan Ford Sales, 2 B.R. 350, 353-54 ___ ____ __________________________ & n.10 (Bankr. D. Me. 1980) (citing Report of the Comm. on the Judiciary, House of Representatives, To Accompany H.R. 8200, H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 4, 89-91, 99, 107 (1977)). Under the Code, therefore, the debtor in possession or trustee must ensure "parties in interest" adequate notice and opportunity to be heard before their interests may be adversely affected. ______ See, e.g., Bankruptcy Code 363(b) ("The Trustee, after notice ___ ____ _____ ______ and a hearing, may use, sell, or lease, other than in the ___ _ _______ _____ ____ __ ___ ordinary course of business, property of the estate.") (emphasis ________ ______ __ ________ added); Fed. R. Bankr. P. 6004(a) (mandating notice of proposed sale); 2002(a)(2) (20 days' notice by mail to "parties in interest"); see also, e.g., Bankruptcy Code 1109(b), 11 U.S.C. ___ ____ ____ 1109(b) ("parties in interest" have "right to be heard" in chapter 11 case). The term "parties in interest" encompasses not only entities holding "claims" against the debtor, but any entity whose pecuniary interests might be directly and adversely affected by the proposed action. See, e.g., Yadkin Valley Bank & ___ ____ ____________________ Trust Co. v. McGee (In re Hutchinson), 5 F.3d 750, 756 (4th Cir. _________ _____ _________________ 1994); In re Athos Steel & Aluminum, Inc., 69 B.R. 515, 519 _____________________________________ (Bankr. E.D. Pa. 1987). "[N]otice . . . means . . . such notice as is appropriate in the particular circumstances . . . ." ___________ __ ___ __________ _____________ Bankruptcy Code 102(1), 11 U.S.C. 102(1) (emphasis added); Fed. R. Bankr. P 2002(k) (empowering court to order publication 11 of notice to "parties in interest" where "desirable" or notice by mail is "impracticable"). Thus, in the first instance the Code consigns to the proponents, rather than to the bankruptcy court, the preliminary determination whether a proposed disposition of estate assets adversely affects "parties in interest." See In re ___ _____ Sullivan Ford, 2 B.R. at 353-54 ("appropriate" notice to "parties _____________ in interest" is indispensable); cf., e.g., In re Northern Star ___ ____ ____________________ Indus., Inc., 38 B.R. 1019, 1021 (E.D.N.Y. 1984) (hearing _____________ _______ dispensable if parties in interest are afforded proper notice and __ interpose no timely objection); In re Robert L. Hallamore Corp., ________________________________ 40 B.R. 181, 183 (Bankr. Mass. 1984) (same); Fed. R. Bankr. P. 6004, advisory committee note, subsection (e).9 Bankruptcy Code 102(1) is founded in fundamental notions of procedural due process. See In re Center Wholesale ___ _______________________  ____________________ 9The Code "notice" requirements have even greater force in a case like the present, where the order approving the proposed sale authorized a transfer of substantially all chapter 11 estate _____________ ___ assets for present purposes, the functional equivalent of an order confirming a conventional chapter 11 reorganization plan. As such, the order confirming a chapter 11 liquidation sale warrants especial bankruptcy court scrutiny. See In re Abbotts ___ _____________ Dairies, 788 F.2d 143, 150 (3d Cir. 1986) (noting that "[  _______ 363(b)(1)] mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan"); In re Wilde Horses Enters., 136 B.R. 830, __________________________ 841 (Bankr. C.D. Cal. 1991) ("'The key to the reorganization _______________________________ Chapter . . . is disclosure. . . .'") (citation omitted) _______________________________ (emphasis added); In re George Walsh Chevrolet, Inc., 118 B.R. ___________________________________ 99, 101 (Bankr. E.D. Mo. 1990); In re Channel One Communications, _________________________________ Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); In re Industrial ____ ________________ Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. ________________________________________________________ 15, 17 (Bankr. E.D. Pa. 1987); see generally David A. Skeel, The ___ _________ ___ Nature and Effect of Corporate Voting in Chapter 11 Re- _________________________________________________________________ organization Cases, 78 Va. L. Rev. 461, 496 (1992) (collecting __________________ cases advocating "enhanced scrutiny" of liquidation sales ________ ________ preceding chapter 11 plan confirmation). 12 Inc., 759 F.2d 1440, 1449 (9th Cir. 1985); In re Garland Corp., 6 ____ ___________________ B.R. 456, 459 (Bankr. 1st Cir. 1980) ("The right to be heard 'has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.'") (quoting Mullane v. Central Hanover Bank _______ ____________________ and Trust Co., 339 U.S. 306, 314 (1950)). Since Taylor and ______________ Western Auto, as "parties in interest," were never afforded "appropriate" notice of the chapter 11 proceeding, the chapter 11 plan, or the privately negotiated terms of the asset transfer agreement, not only do their state-law based successor liability claims against Arms survive the chapter 11 proceeding but their claims against Debtor Industries as well. See, e.g., Dalton Dev. ___ ____ ___________ Project v. Unsecured Creditors Comm. (In re Unioil), 948 F.2d _______ __________________________ _____________ 678, 683 (10th Cir. 1991) (Bankruptcy Code) (chapter 11 claim whose holder was afforded no notice is not subject to discharge); 2 Lawrence P. King, Collier on Bankruptcy, 363.13, at 363-43 ______________________ (15th ed. 1992) (noting that the Code concern for finality in ________ bankruptcy sales "will not, however, protect a party buying from the trustee in a sale free and clear of liens where no notice is given to the lienholder [and] [s]uch a purchaser will be held to have purchased subject to the lien"); Bankruptcy Code 727(a)(1), 1141(a), (d)(3), 11 U.S.C 727(a)(1), 1141(a), (d)(3); see also City of New York v. New York, New Haven & ___ ____ __________________ _______________________ Hartford R.R., 344 U.S. 293, 296-97 (1953) (Bankruptcy Act).  _____________ Thus, even assuming that the Western Auto successor liability claim constituted an "interest" in the Debtor 13 Industries chapter 11 assets transferred to Arms and that it would be extinguishable under section 363(f) "after notice and a hearing," Bankruptcy Code 102(1), 11 U.S.C. 102(1); but cf. ___ ___ Zerand-Bernal Group v. Cox, 23 F.3d 159, 164 (7th Cir. 1994) ____________________ ___ (Posner, C.J.) (suggesting that 363(f) cannot be employed to extinguish successor product-line liability claims), there can be no question that its claim could not be extinguished absent a showing that Western Auto was afforded appropriate notice in the particular circumstances. See Bankruptcy Code 1109(a), 11 ___ U.S.C. 1109(a); Fed. R. Bankr. 2002(a)(2), 2002(k), 6004(a); see also Hoffman v. Hoffman, 157 B.R. 580, 584 (E.D.N.C. 1992) ___ ____ _______ _______ (burden rests with trustee or debtor in possession to establish appropriate notice). Arms concedes that Debtor Industries never attempted notice to retailers or wholesalers of firearms manufactured by Debtor Industries. Arms now argues that direct notification would have entailed exorbitant financial and logistical burdens unwarranted in the circumstances. There is no suggestion, however, that either the identity or the whereabouts of large-volume firearms distributors like Western Auto did not appear in Debtor Industries' business records as wholesalers or retailers of its firearms. Furthermore, the asset transfer agreement itself disclosed that forty-four product liability claims were pending in the chapter 11 proceedings against Debtor Industries by the time the asset transfer was consummated, see ___ supra note 3, which strongly suggests that Debtor Industries may _____ have been on notice that certain types of firearms (hence, 14 particular distributors) may have been prominent candidates for future indemnification claims. These unresolved factual determinations were for the bankruptcy court, had the parties to the all-asset transfer alerted the court to their intention to negotiate the "free and clear" transfer term at issue here. Even assuming direct notice were proven impracticable, however, Debtor Industries concededly made no attempt to provide notice by publication, see Fed. R. Bankr. P. 2002(k); Novak v. Callahan (In ___ _____ ________ __ re GAC Corp.), 681 F.2d 1295, 1300 (11th Cir. 1982) (direct mail ____________ unnecessary if class large); Trump Taj Mahal Assocs. v. Alibraham _______________________ _________ (In re Trump Taj Mahal Assocs.) 156 B.R. 928, 938-41 (Bankr. D. ______________________________ N.J. 1993) (notice by publication may be adequate for "unknown" creditors). As it was never determined "appropriate in the particular circumstances" for Debtor Industries and Arms to dispense with all notice and opportunity to be heard on the part of potential claimants like Taylor and Western Auto, it would border on the bizarre to conclude that the third-party complaint Western Auto filed against Arms in Alaska state court threatened disruption to any legitimate function served by the Bankruptcy Code priority scheme which Debtor Industries and Arms subverted in their private negotiation of the asset transfer agreement. Furthermore, it cannot seriously be questioned that the central "notice and hearing" requirement prescribed by the Bankruptcy Code would be eviscerated were we to presume, as Arms belatedly _______ suggests, that an entire class of future product liability 15 claimants was beyond the purview of "such notice . . . and such opportunity for a hearing as [was] appropriate in the particular circumstances . . . ," Bankruptcy Code 102(1)(A), 11 U.S.C. 102(1)(A). B. "Chilling" Future Chapter 11 Liquidation Sales B. "Chilling" Future Chapter 11 Liquidation Sales _____________________________________________ As an additional basis for injunctive relief, the bankruptcy court expressed the concern that permitting state- court successor liability actions to proceed would "chill" chapter 11 asset bidding because all-asset transfers "free and clear" would be seen as unenforceable against similarly situated product liability claimants. Once again we must disagree. We are satisfied that this largely illusory concern is entirely of the parties' own making, brought on by their mutual arrangement for effecting an all-asset transfer without regard to basic Bankruptcy Code notice requirements. Thus, even assuming that state-law based successor product-line liability claims may be barred through recourse to Bankruptcy Code 363(f), but see ___ ___ Zerand-Bernal Group, 23 F.3d at 164, the all-asset transfer to ___________________ Arms could effect no settlement or discharge of the Western Auto claim against Debtor Industries let alone the state-law based _________ successor liability claim against Arms absent both appropriate notice and court approval. See supra note 9.10  ___ _____  ____________________ 10The procedures utilized below differed markedly from those employed in the cases cited by the bankruptcy court. See, e.g., ___ ____ Paris, 132 B.R. at 506 n.2 (order approving sale incorporates _____ extant counteroffer by reference); In re White Motor, 75 B.R. at ______ _________________ 947 (approval order confirms extant sale agreement "in all re- ______ spects"); see also Zerand-Bernal Group, 23 F.3d at 161 ___ ____ _____________________ (bankruptcy court approval order "reserv[ed] jurisdiction to 16 The failure to afford appropriate notice pursuant to Bankruptcy Code 102(1) and to obtain bankruptcy court approval of the asset transfer agreement terms privately negotiated between Debtor Industries and Arms precluded a legitimate basis for enjoining the Alaska state court action. See In re Federal ___ _____________ Shopping Way, 717 F.2d 1264, 1270 (9th Cir. 1983) (noting that a ____________ bankruptcy court has no jurisdiction to issue "an injunction to enforce an order [it] did not make"); In re Wilde Horses, 136 ___________________ B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("The essential purpose served by disclosure [in an all-asset sale] is to ensure that parties in interest are not left entirely at the mercy of the debtor and others having special influence over the debtor."); see also supra notes 2 & 8. Participants in chapter 11 all-asset ___ ____ _____ sales parties and bidders alike can avoid this jurisdictional "no man's land" by ensuring compliance with Code notice requirements to "parties in interest," see Bankruptcy Code ___  ____________________ enforce" extant agreement containing a provision which ______ extinguished product liability claims). The order purportedly approving the asset transfer to Arms preceded the private ________ agreement between the parties to transfer Debtor Industries' assets "free and clear" of future product liability claims. Compare, e.g., In re G.S.F., 938 F.2d at 1478 (indicating that _______ ____ ____________ the pertinent inquiry is what the court order said, not what the ____ ___ court may have intended to say). After prescribing protective ________ provisions for the benefit of objecting creditors who had been _________ afforded appropriate notice of the proposed asset transfer, the bankruptcy court order pre-authorized the asset transfer absent ______________ either notice or substantive protections for holders of contin- gent product liability claims in the confirmed chapter 11 plan or the order approving the asset transfer agreement. Indeed, there is no indication in the appellate record that the bankruptcy court itself learned about the terms on which the parties to the asset transfer agreement proposed to deal with such contingent product liability claims until after Arms commenced the present adversary proceeding to enjoin the Alaska state court action. 17 102, 11 U.S.C. 102, and, in problematic circumstances, by securing a timely bankruptcy court determination as to the notice and opportunity for hearing appropriate in the particular circumstances. See In re Blehm Land & Cattle Co., 71 B.R. 818, ___ ______________________________ 822-23 (D. Colo.) (noting that the bankruptcy court serves as no mere "rubber stamp" under Bankruptcy Code 362(d), 363(b), 364(b); and "refus[ing] to assume that the unapproved contractual Agreement would have been approved by [the court]"), rev'd on _____ __ other grounds, 859 F.2d 137 (10th Cir. 1988). _____ _______ III III CONCLUSION CONCLUSION __________ We express no view as to whether Bankruptcy Code 363(f) enables the extinguishment of state-law based successor "product-line" liability claims. But see Zerand-Bernal Group, 23 ___ ___ ___________________ F.3d at 164. We hold only that the parties to an all-asset transfer conducted under the auspices of chapter 11 are not entitled to rely on the protective jurisdiction of the bankruptcy court to enjoin the prosecution of a state-law based successor product-line liability action against an all-asset transferee when the state court plaintiff was neither afforded appropriate notice of the material terms of the all-asset transfer, nor of the chapter 11 plan. Moreover, even assuming appropriate notice under Bankruptcy Code 102(1), prior to dispensing injunctive relief the bankruptcy court must ascertain, at the threshold, that the particular successor liability action poses a genuine 18 threat to the legitimate operation of the provisions of the Bankruptcy Code, and not merely to the private enforcement of a closet term in an agreement negotiated between the chapter 11 debtor and its successor. As there was no threshold showing in the present case, we need not consider the other prerequisites to permanent injunctive relief. See supra notes 7 & 8. The ___ _____ district court order must be affirmed. The district The district _______________ court order vacating the bankruptcy court injunction is affirmed; court order vacating the bankruptcy court injunction is affirmed; _________________________________________________________________ costs to defendant-appellee.  costs to defendant-appellee ___________________________ 19